UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| Consumer Financial Protection Bureau, | Civil Action No. |
| Plaintiff, | COMPLAINT |
| v. | |
| Sprint Corporation, | |
| Defendant. | |



The Consumer Financial Protection Bureau (the "Bureau") brings this action against Sprint Corporation ("Sprint") and alleges as follows:

### Introduction

1.      From 2004 to December 2013, Sprint charged its wireless customers for unauthorized third-party charges. These charges cost Sprint's customers millions of dollars each year.

2.      Sprint unfairly charged its customers by creating a billing and payment-processing system that gave third parties virtually unfettered access to its customers' accounts. This access allowed third parties to "cram" unauthorized charges onto wireless bills.

3.      Sprint automatically enrolled customers in its third-party billing system without their knowledge, much less their consent. Many customers were therefore unaware of the unauthorized charges.

4.     Sprint continued to operate its flawed system despite numerous red flags, such as high refund rates and complaints from customers, law-enforcement agencies, and consumer groups.

5.     Sprint profited from this system because it shifted the risk to its customers, who had to pay third-party charges under the company's Terms and Conditions of Service ("Terms & Conditions"). While its customers suffered losses, Sprint retained 40% of the gross revenue it collected for third-party charges, totaling hundreds of millions of dollars.

## Jurisdiction and Venue

6.     This Court has subject-matter jurisdiction over this action because it presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345 and 12 U.S.C. § 5565.

7.     Venue is proper because Sprint transacts business and has locations in this District. 12 U.S.C. § 5564(f).

## Parties

8.     The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products and services under "Federal consumer financial laws." 12 U.S.C. § 5491(a). The Bureau is authorized to commence civil actions by its own attorneys to address violations of Federal consumer financial laws, including the prohibition on covered persons from engaging in any unfair, deceptive, or abusive act or practice under the Consumer Financial Protection Act of 2010 ("CFPA"). 12 U.S.C. §§ 5564(a)-(b), 5531, 5536.

9.      Sprint extends credit to, and processes payments for, consumers in connection with goods and services that Sprint does not directly sell or that consumers do not directly purchase from Sprint. Sprint is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(6), (15)(A)(i) & (vii).

## Factual Background

### I.      Landline Third-Party Billing Transferred to Mobile Phones

10.      In the 1990s, telephone companies opened their billing platforms to third parties. Although third-party billing transformed telephone carriers into large-scale credit issuers and payment processors, they instituted few, if any, compliance measures to ensure that charges on customer bills were authorized and accurate.

11.      By the late 1990s, federal and state authorities realized that nearly all third-party landline charges were unauthorized. In 1998, however, larger telephone companies convinced government authorities to allow the industry to self-regulate through voluntary guidelines.

12.      Unauthorized billing not only persisted, but grew after self-regulation. In 2011, the Federal Communications Commission estimated that each year 15-20 million households were harmed by landline cramming. A 2011 report by the Senate Commerce Committee's staff concluded that about 300 million third-party charges appeared on landline bills each year, totaling more than $2 billion annually.

13.      Despite common knowledge that this system invited unauthorized charges, Sprint replicated the landline, third-party model – outsourcing compliance and

billing functions to billing aggregators without adequate oversight – in its wireless business.

## II.   Unauthorized Charges for Premium Short Messaging Services

14.     From about 2004 through 2013, nearly all wireless third-party billing involved goods called "premium text messages" or "premium short messaging services" ("PSMS") because they were frequently delivered by text messages. The goods included ringtones, wallpaper, and text messages providing flirting tips, horoscopes, and other digital content. Some third-party goods were one-time charges, costing about $0.99 - $4.99. Often, they were monthly subscriptions that cost about $9.99 a month.

15.     Merchants typically marketed PSMS products through online advertisements. Customers clicked on ads that brought them to websites asking them to enter their cellphone numbers. Under industry guidelines, the websites were supposed to disclose prices and other terms and conditions, including whether the charges were recurring. After customers entered their cellphone numbers, merchants were supposed to send text messages requesting replies to confirm the purchases. Merchants then delivered the products to the cellphones through Sprint's network. After customers purportedly received the products, Sprint, relying on information provided by merchants and routed by billing aggregators, placed the charges on customer bills.

16.     Some merchants, however, advertised coupons or free giveaways unrelated to the digital content they purportedly provided. The false or misleading advertisements tricked customers into entering their cellphone numbers. When a customer received a text message from the merchant, she responded believing she was going to receive the

advertised coupon or free item, when in fact she unwittingly "purchased" a monthly subscription that continued until she canceled the service.

17.    Many times, merchants simply crammed fabricated charges onto Sprint's bills without sending any communications or delivering any products to customers. The unauthorized charges often continued undetected for many months.

18.    Numerous complaints from Sprint customers, spanning several years, describe how they were victimized by these or similar schemes. The complaints also show that Sprint failed to respond to complaints or provide full refunds.

## III.    Sprint Unfairly Charged Its Customers

19.    Sprint unfairly billed its customers for unauthorized PSMS charges by (i) enrolling customers in third-party billing without their authorization; (ii) giving third parties access to its customers and its billing system without implementing adequate compliance controls; (iii) failing to adequately resolve customer disputes; and (iv) ignoring warnings from customers, government agencies, and public-interest groups.

### A.    Automatic Enrollment

20.    Sprint automatically enrolled customers in third-party billing without their consent. This policy helped perpetuate wrongful third-party-billing because many customers did not spot unauthorized charges, as they were unaware that third parties could place charges on their bills.

### B.    Inadequate Compliance and Controls

21.    Sprint selected the merchants permitted to use its system and conducted some due diligence before onboarding them. It did not, however, directly interact with

the merchants. Sprint, for example, did not directly require merchants to (i) obtain customer authorization for purchases; or (ii) comply with industry guidelines. Sprint also did not compile the third-party-billing activity that appeared on the invoices it sent to customers.

22.     Sprint outsourced these compliance and payment-processing functions to vendors called billing aggregators without properly overseeing the aggregators. Sprint relied on "compliance with laws" provisions in its agreements with the aggregators, which provided Sprint with breach-of-contract remedies, but did little to protect customers.

23.     The lack of oversight created blind spots for Sprint that resulted in numerous unauthorized charges. For example, one of Sprint's two primary billing aggregators knowingly helped certain merchants cram unauthorized charges onto bills from at least January 2011 to November 2013.

C.     Failure to Respond to Customer Complaints

24.     When customers contacted Sprint about unauthorized charges, the company often did not adequately resolve the disputes. In some instances, Sprint refused to provide refunds and only offered instructions on how to block future third-party charges.

25.     Other times, Sprint refused to provide refunds and referred customers to the merchants. Sprint, at times, gave partial refunds or refunds for a few months, but rarely for all months that the customer incurred the unauthorized charges.

D.    Failure to Heed Red Flags

26.    Sprint ignored, or consciously avoided, numerous red flags highlighting the significant flaws in its third-party-billing system.

27.    First, it did not track customer complaints about unauthorized charges. Sprint therefore declined to employ a basic mechanism that could have helped reveal the flaws and risks in its system.

28.    Second, in 2010, Sprint settled a law-enforcement action related to wireless cramming with the Florida Attorney General.

29.    Third, Sprint continued to outsource payment processing and compliance to billing aggregators after those aggregators agreed to pay claims pursuant to wireless-cramming settlements in 2008 to 2010.

30.    Fourth, refund rates for certain merchants ranged from 20-50%. Though extremely high, those rates likely understate the problem because many customers never learned about the unauthorized charges, and when they did, Sprint often refused to give full refunds.

31.    Despite the high refunds rates for certain merchants, Sprint rarely terminated their access to its customers and billing system. Rather, after several years with limited compliance measures, Sprint devised a system of financial incentives and penalties to encourage billing aggregators to keep refund rates below certain thresholds. Because billing aggregators received more money if merchants generated more charges, they had an incentive to increase transaction volume, while hiding unauthorized charges to keep refund rates below the thresholds.

## IV.   Sprint Transferred the Risk and the Harm to Consumers

32.    While Sprint outsourced compliance and fraud-prevention, it maintained tight control over the collection, processing, and distribution of payments.

33.    Sprint's Terms and Conditions did not differentiate between its own charges and those of third parties. Non-payment subjected customers to potential late fees, service termination, collections, and reporting to credit bureaus. Customers had to pay unauthorized third-party charges unless Sprint elected to provide refunds, which it often did not.

34.    Sprint reaped lucrative profits from third-party billing. It kept about 40% of the PSMS gross revenue and passed along the remainder to the billing aggregators who shared their portions with the merchants. Sprint's share of the revenue totaled hundreds of millions of dollars.

### Violation of the CFPA

35.    The Bureau incorporates the allegations of paragraphs 1-34 of this Complaint.

36.    As described above, Sprint's actions and omissions, including its failure to take reasonable steps to prevent unauthorized charges, caused or were likely to cause substantial injury to consumers that they could not reasonably avoid and were not outweighed by countervailing benefits to consumers or competition.

37.    Sprint's actions and omissions were therefore unfair acts and practices in violation of §§ 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

## Demand for Relief

The Bureau requests that the Court:

a.     permanently enjoin Defendant from committing future violations of the CFPA;

b.     award damages or other monetary relief against Defendant;

c.     order Defendant to pay restitution to consumers harmed by its unlawful conduct;

d.     order disgorgement of ill-gotten revenue against Defendant;

e.     impose civil money penalties against Defendant;

f.     order Defendant to pay the Bureau's costs incurred in connection with prosecuting this action; and

g.     award additional relief as the Court may determine to be just and proper.

Dated: New York, New York
        December 17, 2014

Respectfully Submitted,

Anthony Alexis
*Acting Enforcement Director*

Jeffrey Paul Ehrlich
*Deputy Enforcement Director*

Natalie R. Williams
*Assistant Litigation Deputy*

James Kim
Genessa Stout
*Enforcement Attorneys*

CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street, NW
Washington, DC 20552
Telephone (Kim): 212-328-7013
Telephone (Stout): 202-435-7920
Facsimile: 202-435-7329
e-mail: james.kim@cfpb.gov
e-mail: genessa.stout@cfpb.gov

*Counsel for Plaintiff*