UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------
CONSUMER FINANCIAL
PROTECTION BUREAU,

        Plaintiff,

        -against-

SPRINT CORPORATION,

        Defendant.
-----------------------------------------

14cv9931

OPINION & ORDER

WILLIAM H. PAULEY III, United States District Judge:

        The State Attorneys General of Connecticut, Vermont, Indiana, and Kansas (the "State AGs") move to intervene and modify the terms of the Stipulated Final Judgment and Order entered on June 30, 2015 (the "Final Judgment," ECF No. 25). Jointly with the State AGs, Defendant Sprint Corporation ("Sprint") seeks modification of the Final Judgment. For the reasons that follow, the State AGs' motion to intervene is granted, but the motions for modification are denied.

## BACKGROUND

        Nearly two years ago, this Court approved a settlement between the Consumer Financial Protection Bureau (the "CFPB") and Sprint, and closed this case. In January 2017, the State AGs sought to revive it by moving to intervene and modify the Final Judgment. Their motion raises an intriguing question: can funds left over from a settlement secured by an agency of the Federal Government in a federal action—and originally destined for the U.S. Treasury— go to the States? It also invokes an ancillary, but related, question: does the States' post-hoc

request encroach on the Federal Government's authority to oversee the terms of a federal consent decree?

A fair reading of the Final Judgment's terms leads this Court to conclude that the relief sought by the State AGs was never contemplated by the parties. The Final Judgment and the documents it incorporates cabin relief to Sprint's third-party billing practices. Moreover, allowing nearly thirty percent of the settlement to fund a measure advocated for primarily by the States would supplant the authority and responsibility of the Federal agency—here the CFPB— to make its own determination of how unexpended settlement funds should be distributed in accord with the parties' intentions.

To better understand this Court's conclusion that the proposed modification is improper, some context is necessary. On June 30, 2015, this Court approved and entered the Final Judgment. That judgment memorialized and incorporated by reference the terms of a $50 million settlement between Sprint and the CFPB, a federal agency tasked with protecting consumers from unfair, deceptive, or abusive practices. (See Final Judgment at ¶¶ 35–37.) The CFPB settlement was one of three separate settlements that Sprint reached with government regulators, the others being the Federal Communications Commission ("FCC") and state authorities from all fifty states and the District of Columbia. These other settlements yielded monetary sums of $6,000,000 and $12,000,000, respectively. (See ECF Nos. 18–6 and 18–7.) The CFPB, FCC, and States' settlements addressed largely the same issue—Sprint's third-party billing practices.

Upon entry of the Final Judgment, and pursuant to the terms of the Sprint Consumer Redress Plan (the "Redress Plan") (ECF No. 21–3), Sprint initiated the process of identifying and processing the claims of affected consumers. Thereafter, beginning in January

2016, Sprint issued approximately $34.9 million in payments to the claimants. Redress to consumers has been complete since the autumn of 2016.

With nearly $15.1 million hanging in the balance, the parties were prepared to transmit the funds to the U.S. Treasury pursuant to a residual clause in the Redress Plan. (See Response of Sprint Corporation ("Sprint Resp."), ECF No. 45 at 2.) But in December 2016, the transfer was put on hold after the CFPB informed Sprint that "the States had a potential proposal for the use [of] the Remaining Funds." (Sprint Resp. at 2.) Contrary to an express provision of the Redress Plan that required Sprint to transfer the remaining funds to the CFPB by September 2016 (see Redress Plan at ¶ 22), the unexpended funds remain in Sprint's hands to this day—their transfer stalled by the States' attempt to re-write the residual clause.

In January 2017, the State AGs filed their motion to intervene and modify the Final Judgment. (Memo. In Support of Joint Motion to Intervene to Modify Stipulated Final Judgment and Order ("State AG Mot."), ECF No. 29.) Their motion seeks to redirect the remaining $15.1 million to finance the completion of the Center for Consumer Protection, an institute operated by the National Attorneys General Training and Research Institute ("NAGTRI"). (State AG Mot. at 4, Ex. B.) In February 2017, the State AGs doubled down on their request, this time in a joint motion with Sprint, seeking to allocate $14 million to NAGTRI and $1.1 million to the 1Million Project, an organization that "provides free devices and service to schools and non-profits to benefit one million low-income high school students." (Joint Submission Regarding Motion to Intervene and Modification of the Proposed Final Order and Judgment ("State AG–Sprint Mot."), ECF No. 40 at 2.) The CFPB, despite being the plaintiff that commenced this action, filed nothing with this Court. It only relayed to the State AGs and Sprint that it would "take[] no position on the proposed modification." (State AG–Sprint Mot. at

3

2.) The FCC also advised the parties "that it would not be responding with any such objections." (State AG–Sprint Mot. at 2.)

In April 2017, confounded by the CFPB's conspicuous silence on this issue, this Court directed the CFPB to respond to the State AGs' motion. This Court also directed the U.S. Department of Justice, acting on behalf of the U.S. Treasury, to weigh in. See Consumer Fin. Prot. Bureau v. Sprint Corp., 2017 WL 1431122, at *2–3 (S.D.N.Y. Apr. 10, 2017) ("April 10 Order").

In May 2017, the CFPB filed a gossamer two-page memorandum, modifying its previous position of indifference to one of steadfast opposition to the State AGs' proposal. (Plaintiff's Memo. on the Joint Motion to Intervene to Modify Stipulated Final Judgment and Order, ECF No. 43.) The DOJ opposed the proposed modification in a thoughtful submission. (Statement of Interest of the United States of America ("DOJ Statement"), ECF No. 42.) In response, Sprint and the State AGs filed separate briefs. Sprint, while still advocating for modification, took a more measured tone, in essence deferring to this Court on the issue. (Sprint Resp. at 5.) The State AGs maintained a full-court press, infusing their brief with a new basis to substantiate their modification request. (Memo. of the State AGs in Response to Statement of Interest of United States and CFPB ("State AG Resp."), ECF No. 44.)

DISCUSSION

I. Intervention

As an initial matter, the State AGs' request for intervention is treated as a separate issue from their application for modification. The "decision to allow a party to intervene for the limited purpose of modifying a [final judgment] does not automatically mean the court will grant

4

the motion to modify" the Final Judgment. In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., 255 F.R.D. 308, 314 (D. Conn. 2009).

Permissive intervention is the proper method for a nonparty to seek modification of a judgment. See AT&T Corp. v. Sprint Corp., 407 F.3d 560, 562 (2d Cir. 2005). Rule 24(b)(2) provides that on "timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." The decision to grant permissive intervention is "wholly discretionary with the trial court." U.S. Postal Serv. v. Brennan, 579 F.2d 188, 191 (2d Cir. 1978).

To determine whether an intervention request is timely, courts may consider: "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." In re Bank of N.Y. Deriv. Litig., 320 F.3d 291, 300 (2d Cir. 2003). "Of these factors, the length of time from notice to application is among the most important." Andrews v. Sony/ATV Music Pub., LLC, 2017 WL 770614, at *9 (S.D.N.Y. Feb. 24, 2017) (internal quotation marks and citation omitted). Here, notice of the State AGs' interest is measured from the time they became aware of the remaining funds to the time they sought to intervene.

The Department of Justice contends the State AGs had notice of their interest "long before" the intervention motion was filed—at least as early as June 30, 2015, the date on which the Final Judgment was entered. (DOJ Statement at 2.) At that point in time, however, the State AGs were only aware of the mere possibility that the settlement funds would not be fully distributed. Sprint had until December 31, 2015 to notify potential claimants and process all properly filed claims. (Redress Plan at ¶ 14.) And with the settlement distribution process

5

scheduled to be completed within ninety days of January 1, 2016 (see Redress Plan at ¶ 19), none of the parties could have known whether funds would remain until after March 30, 2016. The Redress Plan further provides that if "there is any balance remaining after nine months from the Claims Deadline (whether by reason of tax refunds, uncashed checks or otherwise), Sprint will pay that amount" to the CFPB. (Redress Plan at ¶ 22.) Throughout the redress period—at least through September 30, 2016—the only parties privy to the settlement process were Sprint and the CFPB.

Other parties, namely the "Participating States" and the FCC, could enter the picture only after "redress has been administered." (Redress Plan at ¶ 28.) The Redress Plan required Sprint to provide the CFPB "aggregate data" regarding settlement information, such as the number of accountholders, the states in which they live, and the total amount of redress. The Redress Plan then directed the CFPB to share that information with the States and the FCC. (Redress Plan at ¶ 28.) At this point, the States presumably had the relevant information—namely the remaining balance of the settlement fund—to consult with the CFPB and FCC on whether "additional redress to Consumers is wholly or partially impracticable or otherwise inappropriate," and whether the remaining funds could instead be used for "other equitable relief, including consumer remedies, as determined to be reasonably related to the allegations set forth in the Complaint." (Redress Plan at ¶ 29.)

Therefore, the State AGs could not have received notice of an actual interest in the remaining settlement funds any sooner than the end of September 2016. That assessment appears generally consistent with Sprint's narrative, which recounts that Sprint asked the CFPB in the Fall of 2016 what it should do with the remaining funds. (Sprint Resp. at 2.) Why Sprint would ask such a question, and why the CFPB apparently advised Sprint to hold onto the funds,

6

is perplexing because the Redress Plan was crystal clear: any remaining funds were to be wire transferred to the CFPB.  (Redress Plan at ¶ 22.)  The State AGs contend that they were not informed of "the unexpectedly large amount of Remaining Funds until late November 2016," when "the CFPB notified the State AGs and Sprint."  (State AGs Resp. at 3.)  Then in December 2016, the CFPB asked Sprint to "hold off" on wiring the funds to the U.S. Treasury in view of the States' "potential proposal."  (Sprint Resp. at 2.)  Here again, the Redress Plan conferred no authority on the CFPB to allow Sprint to hold the funds.  Assuming the State AGs received notice in November 2016 and sought to intervene in January 2017, their intervention motion is timely.

       The second factor—prejudice arising from the intervention against the parties in this action—is minimal and favors intervention.  The CFPB and Sprint resolved this action in June 2015 through a settlement, which was completely administered by September 2016.  Thus, the purpose of the intervention here is "collateral" and does not prejudice the "adjudication of the rights of the existing parties" because they "have settled their dispute."  United Nuclear Corp. v. Cranford Ins. Co., 905 F.2d 1424, 1427 (10th Cir. 1990).

       The third factor—prejudice against the proposed intervenor if the intervention motion is denied—does not move the needle in either direction.  If denied, the risk of prejudice is minimal since the State AGs entered into their own settlement with Sprint and had the opportunity to allocate those funds toward their consumer protection objectives.

       Finally, there are no unusual circumstances militating in favor of, or against, a finding of timeliness.  Accordingly, the State AGs' motion for intervention is granted.

II. Modification of Final Judgment

The State AGs initially moved for modification of the Final Judgment under Rule 60(a), arguing that the "language in the [Final] Judgment inaccurately reflects its underlying intent to apply the Remaining Funds for consumer protection purposes." (State AG Mot. at 10.) In their latest submission, however, they rely on Rule 60(b)(6), seeking modification on an equitable basis. (State AG Resp. at 2.) Each argument is addressed in turn.

a. Rule 60(a)

Rule 60(a) permits the correction not only of clerical mistakes, but also of inadvertent errors arising from oversight or omission. The State AGs claim the inadvertent error here is that wiring the remaining funds to the U.S. Treasury contravenes the parties' intent to use all funds for consumer protection purposes. (State AG Mot. at 10, 12.)

District courts have considerable discretion in modifying their judgments under Rule 60(a) based on their subjective assessment as to whether their intentions are reflected accurately in the record. See Ferguson v. Lion Holding, Inc., 2007 WL 2265579, at *3 (S.D.N.Y. Aug. 6, 2007). The "heart of the distinction between an error that is correctable under Rule 60(a) and one that is not is that a correction under Rule 60(a) cannot alter the substantive rights of the parties, but rather may only correct the record to reflect the adjudication that was actually made." Dudley ex rel. Estate of Patton v. Penn-America Ins. Co., 313 F.3d 662, 675 (2d Cir. 2002). Rule 60(a) is not "meant to provide a way for parties to relitigate matters already decided, to change errors in what a court has deliberately done, or to attempt to establish a right to relief which the court has not previously recognized." Peyser v. Searle Blatt & Co., Ltd., 2003 WL 1610772, at *1 (S.D.N.Y. Mar. 24, 2003) (internal quotation marks and citations omitted).

8

"In sum, then, Rule 60(a) allows a court to clarify a judgment in order to correct a failure to memorialize part of its decision, to reflect the necessary implications of the original order, to ensure that the court's purpose is fully implemented, or to permit enforcement." L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty., Inc., 956 F. Supp. 2d 402, 410 (E.D.N.Y. 2013) (internal quotation marks omitted). But the rule "does not allow a court to make corrections that, under the guise of mere clarification, reflect a new and subsequent intent because it perceives its original judgment to be incorrect. Rather, the interpretation must reflect the contemporaneous intent of the district court as evidenced by the record." Head Start, 956 F. Supp. 2d at 410 (internal quotation marks and citations omitted).

The critical question here is whether the Final Judgment, which incorporates by reference the Redress Plan, espouses an intent for the settlement funds to be used generally toward consumer protection initiatives, untethered to Sprint's third-party billing practices. By its terms, it does not. Paragraph 29 of the Redress Plan clearly states:

> [I]f funds remain after additional redress is completed, <u>the Bureau</u>, in consultation with the Participating States and the Federal Communications Commission, may apply any such remaining funds for such other equitable relief, including consumer information remedies, as determined to be <u>reasonably related to the allegations set forth in the Complaint</u>.

(emphases added). That clause establishes two things. First, the CFPB is the only party that can apply the unexpended funds toward other equitable relief.[1] The States and FCC are limited to a consulting capacity. Ultimately, the CFPB must determine what other equitable purpose the unexpended funds may serve.

---

[1] Not even Sprint, the counterparty to the settlement agreement and defendant in this action, may object to the CFPB's decision. (See Redress Plan at ¶ 29 ("Sprint will have no right to challenge any actions that the Bureau or its representatives may take under this Paragraph.").)

Despite taking no position on the disposition of the unexpended funds for quite some time, the CFPB ultimately concluded that the Final Judgment "should not be modified." (CFPB Resp. at 2.) Of course, it bears noting that the CFPB's involvement at this juncture in the litigation has been underwhelming. When the State AGs concocted their proposal to fund NAGTRI, the CFPB coyly took no position. This Court wonders whether the CFPB did that to distance itself from a proposal at variance with the Final Judgment.

So this motion, filed by non-party intervenors, comes before this Court only because the CFPB failed to take a position at the outset and defend the Final Judgment that it negotiated and drafted. Had the CFPB—the sole plaintiff in this action—simply concluded then, as it does now, that there was no Rule 60 basis for modification, the monies would have been deposited with the U.S. Treasury more than six months ago.

More importantly, the CFPB, like other government regulators, is a watchdog charged with protecting the public from unfair, deceptive, and abusive practices in the marketplace. See generally Lawsky v. Condor Capital Corp., 2014 WL 2109923, at *13 (S.D.N.Y. May 13, 2014); S.E.C. v. Credit Bankcorp Ltd., 2010 WL 768944, at *2 (S.D.N.Y. Mar. 8, 2010). That duty extends to properly disposing of all funds secured through the resolution of an enforcement action even after the underlying fraud has dissipated and the victims have been made whole.

Until this Court issued its April 10 Order, the CFPB appeared uninterested in the fate of the unexpended funds. See Clinton v. City of New York, 524 U.S. 417, 452 (1998) ("Abdication of responsibility is not part of the constitutional design.") (Kennedy, J., concurring). That is most evident in the fact that the unexpended funds still sit in Sprint's account (see CFPB Resp. at 2; Sprint Resp. at 2) even though the Redress Plan directed Sprint to

wire "any balance remaining after nine months from the Claims Deadline" to the CFPB. (Redress Plan at ¶ 22.) It leads this Court to ask who will guard the guardians.

Second, the form of equitable relief must be "reasonably related to the allegations" regarding Sprint's third-party billing practices. (See Redress Plan at ¶ 29; Compl. ¶¶ 20–31.) The State AGs acknowledge as much, recognizing that "it is unclear whether the continuation and completion of the Center for Consumer Protection through NAGTRI qualifies as a source for equitable relief reasonably related to the allegations in the Complaint." (State AG Mot. at 12.) Simply put, the State AGs' proposal does not reflect the parties' true intent. The Final Judgment serves one purpose—to provide redress in the form of monetary payments to consumers injured by Sprint's third-party billing practices. Nowhere in the Final Judgment or the Redress Plan is there any language supporting the State AGs' view that leftover funds should broadly aid consumers.

Nor does the reference to "Participating States" or the FCC, as parties with whom the CFPB should consult in determining how best to dispose of any unexpended funds, change the analysis. The Redress Plan simply provides for the States and the FCC to be consulted about any other equitable relief for which the remaining funds may be used because, they too, were involved in parallel litigations against Sprint. That makes sense because it provides a way for the parties to coordinate the various forms of equitable relief toward which unexpended funds—both from this action and the other settlements—could go. But the States or FCC's views are not binding on the CFPB, which is obliged to make an independent determination about where to send the remaining funds.

b. Rule 60(b)(6)

In their latest response, the State AGs seek modification under Rule 60(b)(6), which provides that a court may relieve a party or its legal representative from a final judgment "for any other reason that justifies relief." It is well settled that Rule 60(b) may be applied only where the moving party demonstrates extraordinary circumstances or extreme hardship. See Vatansever v. New York City, 2005 WL 2396904, at *1 (S.D.N.Y. Sept. 28, 2005) ("[R]elief is made only on a showing of exceptional circumstances."); McPartland v. Am. Broadcasting Co., Inc., 113 F.R.D. 84, 85 (S.D.N.Y. 1986). Generally, "Rule 60(b) relief is not ordinarily available to non-parties," but the "Second Circuit has allowed non-parties to move pursuant to Rule 60(b) where on the facts of the case the movants were sufficiently connected and identified with the suit to entitle them to standing to invoke" the rule. S.E.C. v. Neto, 27 F. Supp. 3d 434, 446 (S.D.N.Y. 2014) (citing Dunlop v. Pan Am. World Airways, Inc., 672 F.2d 1044, 1052 (2d Cir. 1982)) (ellipses and alterations omitted).

The equities in this action do not weigh in favor of the relief the State AGs seek. First, the unexpended funds at issue arise from a settlement between the CFPB and Sprint. To the extent the State AGs have any role in how the settlement funds are allocated, they are limited to a consultative capacity. Second, the purpose for which the State AGs seek to divert the unexpended funds does not warrant the extraordinary measure of modifying the Final Judgment. The State AGs claim that financing NAGTRI's Center for Consumer Protection will "train, support and improve the coordination of the state consumer protection attorneys charged with enforcement" of consumer protection laws, ultimately benefiting all consumers. (State AG Mot. at 4.) But while that is perhaps a noble undertaking, it does not mean the funds from this action

should be designated for such use.[2]  If the State AGs want to fund NAGTRI with federal dollars, they can, as the Department of Justice suggests, "seek a Congressional appropriation."  (DOJ Statement at 5.)

Condoning an unintended use of the settlement funds—in the absence of any other equitable relief reasonably related to the allegations of the Complaint—would be tantamount to misappropriating funds that otherwise should be in the public fisc.  Importantly, doing so would circumvent "the congressional appropriations process under the guise of Article III" and invoke questions regarding the "proper relationship of our Federal Government's three branches when dealing with the People's money."  Keepseagle v. Perdue, 2017 WL 2111020, at *22 (D.C. Cir. May 16, 2017) (Brown, J., dissenting).  By virtue of the separation of powers enshrined in our Constitution, this Court holds "no influence over … the purse."  THE FEDERALIST NO. 78, at 464 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  The Constitution reserves the appropriations power to elected representatives in Congress and assures "that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants."  Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 427–28 (1990).  The proper body to which the State AGs must make their appeal is Congress.  There is simply no extraordinary hardship or circumstance to justify re-writing the negotiated terms of the Redress Plan and Final Judgment.

---

[2]  The U.S. Attorney General's recent memorandum prohibiting "payments to various non-governmental, third-party organizations as a condition of settlement with the United States," while not directly on point, is instructive.  Jefferson B. Sessions, U.S. Att'y Gen., Prohibition on Settlement Payments to Third Parties, dated June 5, 2017 (the "Sessions Memo").  The Sessions Memo recognizes that the "goals of any settlement are, first and foremost, to compensate victims, redress harm, or punish and deter unlawful conduct," and seeks to end the practice of using settlements to provide "payment or loan to any non-governmental person or entity that is not a party to the dispute."  (emphasis added).

Finally, what makes the State AGs' application even less compelling is that the they entered into a separate settlement with Sprint where they could have negotiated the relief they seek here. But they did not. And trying to do so now—especially when the CFPB has expressed a contrary view and Sprint a tepid one of how the unexpended funds should be used—would hollow out the terms of the Final Judgment. It would permit State actors with, at best, a collateral interest in this Federal action to hijack a significant portion of the settlement funds under the guise of "consumer protection," all for the purpose of underwriting a project that principally benefits the States. Such actions not only erode the lofty standard set forth in Rule 60(b)—that judgments are modified only under the most extraordinary circumstances—but deprive the Federal agency here of its responsibility to monitor and enforce the settlement's terms to completion.

In the absence of equitable relief tied to the allegations in this action, transferring $15.1 million to the U.S. Treasury "inures to the public benefit." United States v. Keyspan Corp., 763 F. Supp. 2d 633, 643 (S.D.N.Y. 2011) (payment of "disgorged proceeds to the Treasury is nevertheless within the reaches of the public interest"); United States v. Morgan Stanley, 881 F. Supp. 2d 563, 569 (S.D.N.Y. 2012). That option, memorialized in paragraph 29 of the Redress Plan, provides a Bentham-like solution to broadly aid consumers and "do the greatest good for the greatest number of people." S.E.C. v. Bear, Stearns & Co. Inc., 626 F. Supp. 2d 402, 419 (S.D.N.Y. 2009) (internal quotations omitted). Recognizing the full force of that provision ensures that "the hidden taxpayer, the average citizen—not someone who received, rather someone who paid in" receives the benefit of the remaining funds. Amity Shlaes, THE FORGOTTEN MAN: A NEW HISTORY OF THE GREAT DEPRESSION 128 (2007). The time when these funds should have been remitted to the People is long past.

## CONCLUSION

For the foregoing reasons, the State AGs and Sprint's motions are denied. Sprint is directed to wire the remaining funds to the CFPB pursuant to paragraph 22 of the Redress Plan forthwith. The CFPB is directed to deposit the unexpended funds, including any accrued interest, with the U.S. Treasury as disgorgement forthwith.

The Clerk of Court is directed to terminate the motion pending at ECF No. 28.

Dated: June 20, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.